IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

- - -

SHIELDMARK, INC.,      )

     Plaintiff,      )

     vs.           )   1:12-CV-00223-DCN

INSITE SOLUTIONS,      ) Judge Donald C. Nugent

     Defendant.      )

- - -

Deposition of JERRY M. SERRA, Ph.D., a
Witness herein, called by the Defendant for
cross-examination pursuant to the Federal
Rules of Civil Procedure, taken before me,
the undersigned, Michael G. Cotterman, a
Notary Public in and for the State of Ohio,
at 106 South Main Street, 4th Floor, Akron,
Ohio, on Friday, the 30th day of August,
2013, at 10:50 o'clock a.m.

--------------------------------------------

BISH & ASSOCIATES, LLC

150 Smokerise Drive

Wadsworth, Ohio  44281

330-336-1280

FAX 330-336-7956

E-Mail: bishinfo@bish-associates.com

APPEARANCES:

        On Behalf of the Plaintiff:

                Dubyak, Connick, Sammon,
                Thompson & Bloom


        By:  Mark B. Cohn, Att. at Law
                3401 Enterprise Parkway
                Suite 205
                Cleveland, Ohio  44122
                216-364-0500
                mark@markcohnlaw.com
                Brennan, Manna & Diamond
        By:  W. Scott Harders, Att. at Law
                75 East Market Street
                Akron, Ohio  44308
                330-253-3715
                wsharders@bmdllc.com


        On Behalf of the Defendant:


                Renner, Kenner, Greive, Bobak,
                Taylor & Weber
        By:  Ray L. Weber, Att. at Law
                400 First National Tower
                106 South Main Street
                Akron, Ohio  44308
                330-376-1242
                rlweber@rennerkenner.com


ALSO PRESENT:


                Thomas R. Goecke
                Cliff Lowe
                Eric Gaum


                      - - -

I N D E X

Exhibit No.                         Page/Line


Defendant's Exhibit No. 52          16 / 18
Defendant's Exhibit No. 53          19 /  7
Defendant's Exhibit No. 54          32 / 16
Defendant's Exhibit No. 55          57 /  1
Defendant's Exhibit No. 56          65 / 15
Defendant's Exhibit No. 57          67 /  2
Defendant's Exhibit No. 58          72 /  1




- - -


Examination By:                     Page/Line



MR. WEBER                            4 /  9
                                    85 / 10
                                    96 / 20


MR. COHN                            75 / 15
                                    96 /  1



- - -

1          JERRY M. SERRA, Ph.D.

2    of lawful age, a Witness herein, called for

3    examination, as provided by the Rules of

4    Civil Procedure, being by me first duly

5    sworn, as hereinafter certified, deposed and

6    said as follows:

7              - - -

8            CROSS-EXAMINATION

9    BY MR. WEBER:

10      Q.  Would you state your name for the

11   record please.

12      A.  Jerry M. Serra.

13      Q.  Okay.  And Mr. Serra, you've been

14   retained by ShieldMark in the matter that

15   brings us together; is that correct?

16      A.  Yes.

17      Q.  When were you retained by ShieldMark?

18      A.  About a year ago, I don't have the

19   exact date but I'd say it was about a year

20   ago.

21      Q.  And that was to be an expert in this

22   case, correct?

23      A.  Yes.

24      Q.  Do you have any prior relationship

25   with ShieldMark?

1    A.  No.

2    Q.  Okay.  So the first time you ever had

3  any involvement with ShieldMark was a year

4  ago; is that correct?

5    A.  Yes.

6    Q.  And when I use the term ShieldMark,

7  did you also understand that to include Mr.

8  Goecke, Tom Goecke?

9    A.  Yes, when I saw the patent, I saw his

10  name on the patent.

11    Q.  Okay.  So just to be clear, you had

12  no relationship with Mr. Goecke, with

13  ShieldMark, with this, with the patent in

14  suit, the '480 patent or its application

15  before the Patent Office prior to about a

16  year ago; is that correct?

17    A.  Correct.

18    Q.  Okay.  And who contacted you on

19  behalf of ShieldMark?

20    A.  I believe it was Scott.

21    Q.  Okay.  Scott Harders?

22    A.  Yes.

23    Q.  Okay.  And were you --

24    A.  Well, actually the Pressure Sensitive

25  Tape Council gave me Scott's name and said

1    they were looking for someone that could help

2    them with a case, and then I called Scott and

3    that's how we got connected.

4         Q.  Okay.  So you called Scott and what

5    did you understand Scott was looking for?

6         A.  An expert witness that could look at

7    some -- a patent and help him understand the

8    patent from a technical perspective.

9         Q.  Okay.  Did you understand -- what did

10   you -- well, strike that.

11             Were there any particular

12   issues that he raised with you at the onset

13   with regard to understanding the patent or

14   the technology?

15        A.  No, it was fairly, our first

16   discussion was fairly vague.  And then when

17   we decided that we'd go into, that they'd

18   bring me on to help them, I got the copy of

19   the patent.  And that's when I started to

20   really understand the detail, once I read the

21   patent.

22        Q.  Okay.  And what was the first issue

23   -- well, strike that.

24             I assume that you've become

25   involved in various issues that surround the

1   '480 patent; is that correct.

2       A.  Yes, it was -- yes.

3       Q.  What was the first issue that you

4   recall?

5       A.  The very first one, oh, boy, I'm

6   trying to remember what it was.

7       Q.  Well, can you just share with me

8   issues that you recall?

9       A.  Well, we talked about --

10              MR. COHN:  Well, wait.

11              MR. WEBER:  That bear upon the

12  '480 patent.

13              MR. COHN:  And let me object to

14  the extent you're asking for conversations

15  between Scott Harders and Dr. Serra and I

16  asked Dr. Serra not to -- he can certainly

17  answer the question without talking about the

18  conversation.

19  BY MR. WEBER:

20      Q.  Yeah, I just want your understanding,

21  I don't want -- you don't have to tell me

22  what Mr. Harders said to you, I just want to

23  know your understanding of the issues that,

24  that you've been involved with with regard to

25  the '480 patent?

Page 8

1      A.  You want the big picture or do you

2  want the first?

3      Q.  Well, let's start with the big

4  picture and then we'll focus in on the plants

5  and the flowers and the bees and the other

6  things that are in the picture.

7      A.  We started, when I got the patent

8  then it was reading the patent.  And it

9  boiled down to, if I could summarize it

10  quickly, it boiled down to looking at the

11  claims relative to the construction of the

12  product and relative -- well, it was mostly

13  around the construction, meaning the

14  thickness.

15              And then the claim language,

16  explaining the claim language from, from my

17  perspective as an expert in the field.  And

18  I would say that's where we started.

19      Q.  Okay.  When you say the construction

20  of the product, what product are you talking

21  about?

22      A.  It was the product described in the

23  '480 patent.

24      Q.  Did you actually have a product that

25  you were looking at?

1    A.  Not at that time.

2    Q.  Okay.  Let's jump back just a little

3  bit, have you ever been deposed before?

4    A.  No, sir.

5    Q.  I assume you've been told a little

6  about what to expect here and been told what

7  a nice guy I am?

8    A.  Very nice.

9    Q.  And how smoothly this was going to

10  go?

11        MR. COHN:  I think it was

12  deceptively nice.

13  BY MR. WEBER:

14    Q.  You understand you are under oath?

15    A.  Yes.

16    Q.  And that a record is being made of

17  these proceedings?

18    A.  Yes.

19    Q.  And you understand that your

20  testimony is given subject to penalty of

21  perjury?

22    A.  Yes.

23    Q.  Okay.  Is this the first case in

24  which you've been, is this the first patent

25  case in which you've been involved?

1      A.  In the sense of?

2      Q.  Being an expert witness?

3      A.  I've been involved with patent cases

4   with my former employer, that was part of my

5   job, but not as an independent from, you

6   know, independent of my former company, no,

7   this is the first time.

8      Q.  Okay.  And you issued an expert

9   report in this matter, correct?

10      A.  I've issued a few, yes.

11      Q.  Okay.  Well, you've only issued one

12   in the matter of this litigation as an expert

13   report, is that fair to say?

14      A.  I can't answer that.  All I know is

15   I've issued several declarations and a couple

16   reports and without looking at them I can't

17   say which, where they went.

18          MR. WEBER:  Let me ask counsel,

19   there is just one expert report though that

20   he offered?

21          MR. COHN:  I think the

22   declarations also disclose opinions, so I

23   think that, whether everything is contained

24   in one document, he's provided several

25   documents that describe his work and

1  findings.

2          MR. WEBER:  How many reports did

3  he prepare in accordance with Federal Civil

4  Rule 26, that's my question?

5          MR. COHN:  I think they could all

6  be said to comply with that federal rule.

7          MR. WEBER:  Well, all right, we

8  may have a problem down the road if you're

9  saying he's going to testify with regard to

10  matters other than what was presented in his

11  expert report of June 20th, 2013, are you

12  telling me that?

13          MR. COHN:  Well, he may, yes, but

14  it won't be anything he hasn't disclosed to

15  you either in documents or the other

16  declarations.

17          MR. WEBER:  I'm not deposing him

18  as a fact witness and I'm not deposing him

19  with regard to --

20          MR. COHN:  The declarations he

21  submitted were as an expert.

22          MR. WEBER:  As an expert before

23  the Patent Office?

24          MR. COHN:  No, I think he

25  submitted some in connection with motions

Page 12

1  that were pending in this Court and those are

2  the ones to which I am referring.

3          MR. WEBER:  Okay.

4  BY MR. WEBER:

5    Q.  The expert report that you authored

6  on or that you signed on or about June 20th,

7  2013, do you recall that one?

8    A.  Yes.

9    Q.  Okay.  You've reviewed that before

10  coming here today?

11    A.  Yes, I read it rather quickly.

12    Q.  And how was that report -- well, in

13  fact did you write this report, the report of

14  June 20th, 2013?

15          MR. COHN:  Isn't that a question

16  you want me to ask?

17          MR. WEBER:  No, it's more artfully

18  presented.

19  BY MR. WEBER:

20    Q.  Did you write the report of June

21  20th, 2013?

22    A.  No, I did not physically write the

23  report.

24    Q.  Okay, did you type it?

25    A.  No.

1     Q.  But you reviewed it before signing it

2   I assume, correct?

3     A.  Yes.

4     Q.  And it is your report?

5     A.  Yes.

6     Q.  And if called upon you will testify

7   in accordance with and consistent with that

8   report; is that correct

9     A.  Yes.

10    Q.  Okay.  I asked you a moment ago

11  about, you know, some of the issues and you

12  said the first one was with respect to claim

13  language and the product.  What were some of

14  the other issues, the next issue that you

15  recall?

16    A.  We talked about, the really first

17  details that we got into were, as I said

18  before, trying to understand the construction

19  and trying to understand what the language

20  meant.  Then also we talked about peel

21  adhesion, how it's measured and the

22  differences and methods.

23            Then from what I can recall

24  we, we had some, I don't know what the word

25  was, someone wanted to look at the claim

1    language and rewrite them so we talked about

2    that.

3                  Then, then we really focused

4    more on what I've already said to you,

5    without repeating myself, the construction

6    and the, by construction I mean the thickness

7    and the entire product.  The hardness was

8    also something we discussed and peel

9    adhesion and that's primarily what it focused

10   around.

11       Q.  Okay.  You said you worked on issues

12   regarding rewriting the claim language, when

13   was that?

14       A.  You know, from memory I'm going to

15   say it was probably two months, three months

16   into it.

17       Q.  Okay.

18       A.  There was, by that there was, I

19   believe there was another law firm that was

20   proposing new language and I was asked to

21   comment on that.

22       Q.  Okay.  Have you -- strike that.

23                  You're aware that the '480

24   patent is undergoing a re-examination, is

25   that fair to say?

1      A.  Yes.

2      Q.  Okay.  Have you been kept advised in

3  that regard?

4      A.  More or less.  I would say yes in

5  that yesterday I reviewed some documents on

6  the re-exam.

7      Q.  Okay.

8      A.  Up until yesterday I hadn't seen

9  them.

10     Q.  You hadn't seen those documents?

11     A.  No.

12     Q.  You had seen other documents though

13  in the re-exam, hadn't you?

14     A.  I'm not sure I could say yes to that.

15  I'd have to really go back and look, I don't

16  think I've seen documents, what I saw

17  yesterday I had not seen.

18     Q.  And there was a, a patent application

19  that continued on from the '480 patent that

20  ultimately issued into another patent, do you

21  recall that?

22     A.  I'm going to have to say I don't

23  remember seeing it.  I'm not saying I didn't

24  see it, I'm saying at this point I can't

25  recall seeing that.

1       Q.  Apart from yesterday, were you

2    previously provided with copies of any Patent

3    Office actions in the re-exam and asked to

4    comment on them?

5       A.  I did see some Patent Office actions

6    but I don't know if that was related to the

7    re-exam, that might have been in the history

8    of the initial patent.

9       Q.  Okay.  Did you provide comments or

10    suggestions on how to respond to the office

11    action?

12       A.  I don't recall that I did.

13       Q.  Did you see drafts of responses to

14    the office action?

15       A.  I did not see drafts.

16              MR. WEBER:  Okay, I'll ask you to

17    mark this as 52.

18                        (Defendant's Exhibit

19                        No. 52 was marked

20                        for identification.)

21    BY MR. WEBER:

22       Q.  I'll hand you what's been marked as

23    Exhibit 52, do you recall seeing that

24    document?

25       A.  Let me take a couple seconds to look

1   through it.

2        Q.   Sure, take all the time you need to

3   look at it.

4        A.   (Doing as requested.)

5        Q.   To help you in your review, maybe to

6   refresh your memory, this is the document by

7   which the Court construed certain claim

8   terms.

9        A.   I did see the results of the terms by

10  the Court.

11       Q.   Okay.  Did you see them in this

12  document?

13       A.   You know, I'll have to tell you I

14  can't recall, I'd have to go back and look

15  to see if I have this document.  But I did

16  see the definition of this, I think I did

17  see it but I'm not a hundred percent sure

18  without going back through my own documents.

19       Q.   And you didn't bring your files with

20  you?

21       A.   I brought some of the files with me;

22  I know I did not bring this one.

23       Q.   Okay.  I'd like for you to look at

24  page six of this document, although you can

25  take whatever time you need.

1      A.  No, that's okay.

2      Q.  Page six, look down at the paragraph

3  that bridges pages six and seven.

4      A.  "The '480 patent..."

5      Q.  Correct.  And you have read and

6  studied the '480 patent quite extensively,

7  haven't you?

8      A.  I've looked at it many times.

9      Q.  And the Court here says the '480

10  patent distinguishes between a, quote, layer

11  of adhesive, quote, and a, quote,

12  double-sided adhesive layer, period, quote,

13  do you see that?

14      A.  Uh-huh.

15      Q.  Do you agree with the Court's

16  assessment of the '480 patent in that

17  regard?

18      A.  Distinguishing between those two

19  words, two quotes?

20      Q.  Right, that the patent distinguishes

21  between a layer of adhesive and a

22  double-sided layer?

23          MR. COHN:  I would suggest that in

24  fairness you put the patent in front of him

25  also.

Page 19

1          MR. WEBER:  Sure, I'd be happy to

2    do that.  I would have thought as short as

3    the patent is he would have had it memorized

4    by now, but we'll do that.

5          MR. COHN:  I don't trust his

6    memory.

7                    (Defendant's Exhibit

8                    No. 53 was marked

9                    for identification.)

10   BY MR. WEBER:

11       Q.  Now you have in front of you a copy

12   of the '480 patent, correct?

13       A.  Yes.

14       Q.  And do you still agree with the Court

15   when the Court said the '480 patent

16   distinguishes between a layer of adhesive and

17   a double-sided adhesive layer?

18       A.  Okay.

19       Q.  You agree with that, correct?

20       A.  Yes.

21       Q.  And do you, reading the next

22   sentence, do you agree with the Court when

23   the Court said, "The inventor clearly used

24   different terms to describe different

25   concepts related to the adhesive"?

1      A.  I can't comment on what the inventor

2   was thinking.

3      Q.  No, well, the Court is not saying

4   what the inventor was thinking, it says,

5   "The inventor clearly used different terms

6   to describe different concepts related to

7   the adhesive," do you agree with the Court?

8              MR. COHN:  I object, he answered

9   that.

10             MR. WEBER:  Go ahead, you can

11  answer.

12             THE WITNESS:  Say that again

13  please.

14             MR. WEBER:  Do you agree with the

15  Court's statement that "The inventor clearly

16  used different terms to describe different

17  concepts related to the adhesive"?

18             MR. COHN:  Objection.

19             THE WITNESS:  Just one second

20  please.

21          Okay, yeah.

22  BY MR. WEBER:

23     Q.  You do agree with the Court,

24  correct?

25     A.  Yes.

1      Q.  Okay.  Turning to page seven, the

2  first full paragraph, first sentence of the

3  first full paragraph on page seven of the

4  Court's order of Exhibit 52 the Court says,

5  If the Court were to adopt ShieldMark's

6  argued interpretation, the choice of

7  distinguishing claim two's, quote,

8  double-sided adhesive layer, quote, from

9  the, quote, adhesive material, quote, in

10  claims one and five would be rendered

11  superfluous, end of quote, did I read that

12  correctly?

13          MR. COHN:  Objection.

14          THE WITNESS:  You read it

15  correctly but I'm not sure I understand what

16  he's saying.

17  BY MR. WEBER:

18      Q.  You don't understand what the Court

19  was saying when it was construing --

20      A.  No, I understand the Court's

21  description of a double-sided adhesive

22  layer, I understand that.  What I don't

23  understand is the next sentence, that it's

24  superfluous, what is he saying, what is the

25  Court saying?

1      Q.  Well, the Court I think is saying --

2   well, in fact I'm not going to tell you what

3   I think the Court is saying because the Court

4   said it quite well.

5             But you understand that the

6   adhesive portion of the invention of the

7   '480 patent is described in different ways

8   in different claims of the patent, don't

9   you?

10            MR. COHN:  Objection.

11            THE WITNESS:  Okay.

12   BY MR. WEBER:

13     Q.  You understand that?

14     A.  Okay.

15     Q.  You don't argue it's not described

16   differently in different claims, do you?

17            MR. COHN:  Objection.

18            MR. WEBER:  And you need to answer

19   audibly.

20            THE WITNESS:  I'm sorry, go ahead

21   and ask it again?

22   BY MR. WEBER:

23     Q.  I mean you agree that the adhesive

24   element of the invention of the '480 patent

25   is described differently in different

```
 1   claims?

 2        A.   Yes.

 3        Q.   Okay.   I'd like for you to turn to

 4   page eight of the Court's order and go down

 5   about one, two, three lines from the top and

 6   over at the end where it starts "The only,"

 7   I'm going to read what the Court said there

 8   and ask you if you agree with that.

 9               The Court said, quote, the only

10   way to give meaning to the term, quote,

11   double-sided adhesive layer, quote, and to

12   differentiate it from the term, quote, layer

13   of adhesive material, quote, is to accept

14   Insite's construction of the term which

15   requires that an adhesive layer be present on

16   both sides of a center layer of non-adhesive

17   material.

18               MR. COHN:  Objection.

19               MR. WEBER:  End of quote.

20               MR. COHN:  That's not correct.

21               MR. WEBER:  What did I read wrong?

22               MR. COHN:  You added a word.

23               MR. WEBER:  What word did I add?

24               MR. COHN:  Layer.

25               MR. WEBER:  I'm going to read it
```

1  again, okay.

2  BY MR. WEBER:

3      Q.  Do you agree with the Court's

4  statement that, quote, the only way to give

5  meaning to the term, quote, double-sided

6  adhesive layer, quote, and to differentiate

7  it from the term, quote, layer of adhesive

8  material, quote, is to accept Insite's

9  construction of the term which requires that

10  an adhesive be present on both sides of a

11  center layer of non-adhesive material, end of

12  quote?

13      A.  I do.

14      Q.  Okay.  And you agree with the Court

15  in that regard, don't you?

16          MR. COHN:  Objection.

17          THE WITNESS:  Yes.

18  BY MR. WEBER:

19      Q.  And then bridging pages eight and

20  nine at the bottom, the sentence that bridges

21  those pages, the Court said the term, quote,

22  double-sided adhesive layer, quote, in claim

23  two, therefore, is to be defined as, quote, a

24  layer of non-adhesive material with adhesive

25  on both sides, end of quote, did I state that

1    correctly?

2        A.  Yes.

3        Q.  Okay.  And you have looked at and

4    carefully examined the accused product in

5    this case, haven't you?

6        A.  I've looked at one product.

7        Q.  Okay.  And you were told that was the

8    accused product?

9        A.  Yes.

10       Q.  And that product does not have a

11   layer of non-adhesive material with adhesive

12   on both sides, does it?

13       A.  That's correct.

14       Q.  So to find infringement of that

15   product you had to disregard the requirement

16   of a layer of non-adhesive material, isn't

17   that correct?

18               MR. COHN:  Objection.

19               THE WITNESS:  Can you state that

20   again?

21               MR. WEBER:  To find infringement

22   you disregarded the requirement of a layer

23   of non-adhesive material, isn't that

24   correct?

25               MR. COHN:  Objection.

1            THE WITNESS:  No.

2  BY MR. WEBER:

3    Q.  Okay, you did not, okay.  Did the

4  claims that just required an adhesive layer

5  require a layer of non-adhesive material?

6            MR. COHN:  In what?

7            MR. WEBER:  Of the '480 patent?

8            MR. COHN:  Objection.

9            THE WITNESS:  That's not what it

10  said here.

11            MR. WEBER:  No, I'm asking you,

12  did the claims that just recited an adhesive

13  layer, did those claims require a layer of

14  non-adhesive material?

15            MR. COHN:  Objection.

16            THE WITNESS:  An adhesive layer

17  can also be a layer that's a double-sided

18  layer.

19            MR. WEBER:  Now would you answer

20  my question?

21            THE WITNESS:  State it again

22  please.

23            MR. WEBER:  Would you read it

24  back.

25  (Previous testimony read back as requested.)

1          MR. COHN:  Objection.

2          MR. WEBER:  You can go ahead and

3    answer.

4          THE WITNESS:  I'm going to say no.

5    BY MR. WEBER:

6       Q.  In order to find infringement you do

7    not distinguish between a layer of adhesive

8    and a double-sided adhesive layer, do you?

9          MR. COHN:  Objection.

10          THE WITNESS:  I'm trying to think

11    how I can answer that.

12    BY MR. WEBER:

13       Q.  Truthfully.

14       A.  Well, absolutely, but it's not quite

15    as simple as that.

16          Yes, I do, when I looked at

17    this from the perspective of infringement,

18    yes, the '480 patent has the double-sided

19    tape, as we call them in the industry, and

20    yes, it has the adhesive layer.

21          When I looked at that, it's

22    obvious that a single layer of adhesive is

23    not the same as a double layer of adhesive,

24    however, the functionality of the two are the

25    same.

1     Q.  Did you in writing your opinion

2   understand when you can and when you cannot

3   use the Doctrine of Equivalents?

4     A.  No.

5     Q.  Nobody ever shared that with you, did

6   they?

7     A.  I'm going to say no.

8     Q.  Okay.  You understand that the Court

9   said that there had to be a non-adhesive

10  material, didn't you?

11          MR. COHN:  Objection.

12          THE WITNESS:  No, I understood the

13  definition of what they said but I didn't

14  understand that they said you have to have

15  this, have to have the double-sided.

16  BY MR. WEBER:

17    Q.  Your goal was to find infringement,

18  wasn't it?

19    A.  No, my goal was to review this and

20  give my opinion of what I thought, what I was

21  reading.

22    Q.  You knew they had filed a case to

23  charge that product with infringement, didn't

24  you?

25    A.  Yes, I did.

1      Q.  Okay.  And how much are you being

2  paid for this?

3      A.  It's in there, it's four hundred

4  dollars an hour.

5      Q.  Do you do consulting work otherwise?

6      A.  Yes.

7      Q.  And what's your rate for that?

8      A.  My normal rate is two hundred dollars

9  an hour.

10      Q.  But it's four hundred dollars to give

11  this kind of testimony; is that correct?

12      A.  Correct.

13      Q.  And why?

14      A.  To be quite honest with you, I have

15  some friends who are patent attorneys that

16  I've worked with through the years and I

17  asked what's the rate for expert witnesses

18  and that's how I came up with the number.

19      Q.  If the Court had said -- well, strike

20  that.

21           If you had understood the Court

22  to say that claim two requires a layer of

23  non-adhesive material, there would be no

24  infringement, is that fair to say?

25           MR. COHN:  Objection.

1               THE WITNESS:  That's fair to say.

2               MR. WEBER:  Okay.

3               MR. COHN:  Now that he's answered

4     your question and I can't be accused of

5     coaching, by that question did you mean to

6     include the Doctrine of Equivalents that the

7     Court said didn't apply?

8               MR. WEBER:  My question is what my

9     question is.

10              MR. COHN:  Your question is vague.

11              MR. WEBER:  No, my question was

12    about as pointed as it could be and so was

13    his answer.

14              MR. COHN:  I disagree.

15              MR. WEBER:  Well, you and I,

16    that's how lawyers make their money.

17              MR. COHN:  Right.

18              MR. WEBER:  And I don't make four

19    hundred dollars an hour.

20              MR. COHN:  Neither do I.  But I

21    objected after the question was answered, I

22    thought I would give you the reason for my

23    objection.

24              MR. WEBER:  That's not the first

25    time you've done that, but I appreciate it,

1  that's the first time in the last few days.

2          MR. COHN:  I always ask your

3  permission before I say anything.

4          MR. WEBER:  I'm just sparring with

5  you.

6          MR. COHN:  Well, that particular

7  comment was an insult.

8          MR. WEBER:  Well, okay, if you

9  were insulted I apologize because I was

10 trying not to.

11         MR. COHN:  We'll get through it,

12 my skin is thick.

13         MR. WEBER:  I think it is and it

14 gets thicker as we get older.

15 BY MR. WEBER:

16    Q.  Okay.  Now, you're familiar with the

17 term "substantially uniform thickness" as

18 used in claim five, aren't you?

19    A.  Yes.

20    Q.  And if you look at page eleven now

21 of the Court's order, Exhibit 52, down at

22 the bottom, in fact the last sentence on the

23 page says the term, quote, substantially

24 uniform thickness, quote, as used in claim

25 five is, therefore, defined as, quote, a

1    largely but not necessarily wholly uniform

2    distance between the upper surface and the

3    lower surface without significant deviations,

4    protrusions, or steps, end of quote, did I

5    read that correctly?

6         A.  Yes.

7         Q.  And you understood the Court's ruling

8    in that regard, correct?

9         A.  Yes.

10        Q.  Okay.  And in claim five, that phrase

11   that we just read describes a polymer layer,

12   correct?

13        A.  Yes.

14             MR. WEBER:  Okay.  Mark this as

15   the next exhibit.

16                    (Defendant's Exhibit

17                    No. 54 was marked

18                    for identification.)

19   BY MR. WEBER:

20        Q.  Now, do you recognize Exhibit 54?

21        A.  Yes.

22        Q.  And this was the report you authored

23   under Federal Rule 26, correct?

24        A.  Yes.

25        Q.  Okay.  And Local Patent Rule 5.1(b),

1    correct?

2        A.  Yes.

3        Q.  So you have a Ph.D.?

4        A.  Uh-huh.

5        Q.  In what?

6        A.  Biological sciences.

7        Q.  Biological?

8        A.  Yes, with a major in organic

9    chemistry, analytical chemistry.

10       Q.  Is analytical chemistry P chem?

11       A.  No, P chem was physical chemistry.

12       Q.  Okay.

13       A.  They're related but it's different.

14       Q.  So you have a Ph.D. in biological

15   science with some concentration on organic

16   and analytical chemistry?

17       A.  Yes.

18       Q.  And you have forty years of

19   experience in the polymer slash adhesive tape

20   industry, correct?

21       A.  Yes.

22       Q.  And down in the last paragraph there

23   you say -- I mean the last sentence in the

24   first paragraph of Exhibit 54 you say, quote,

25   I consider myself to be a person of ordinary

1    skill in the art of adhesive tapes and

2    adhesive technologies, end of quote, did I

3    read that correctly?

4        A.  Yes.

5        Q.  Okay.  Is that your belief?

6        A.  Yes.

7        Q.  What would be the education level and

8    experience of a person of extraordinary skill

9    in the art?

10        A.  What I have.

11        Q.  But what are you, are you a person

12    of ordinary skill in the art or a person of

13    extraordinary skill?

14              MR. COHN:  Objection.

15              THE WITNESS:  With you I'm being

16    modest.

17    BY MR. WEBER:

18        Q.  You're being modest?

19        A.  Yes.

20        Q.  So in your report you're trying to be

21    modest, is that your testimony?

22        A.  Yes.

23        Q.  Over on page four of your report

24    you're talking about a Shore A hardness of

25    between 92 to 100, correct?

1      A.  Yes.

2      Q.  And here you were testing the accused

3  product; is that correct?

4      A.  I was not testing, I was reading the

5  report.

6      Q.  Okay, I apologize, you were assessing

7  the report.  You say that the Chemsultants

8  report had a hardness in the specified range

9  of 92 to 100?

10      A.  That's what they said.

11      Q.  That's what they said?

12      A.  Yes.

13      Q.  Okay.  And based on those reports you

14  concluded that those tapes include a polymer

15  layer having a Shore A hardness of between 92

16  to 100, correct?

17      A.  Correct.

18      Q.  Do you know exactly what the Shore A

19  hardness was, was it between 92 and 100?

20      A.  I saw the report said it was in that

21  range so that's what I used; I didn't get the

22  exact number.

23      Q.  Did you run any independent tests?

24      A.  No, I did not.

25      Q.  Okay.  Do you know what the

1    temperature was at the time those tests were

2    run?

3         A.  I can say for Chemsultants what it

4    was, only because I know they are an A2LA

5    accredited lab, as is the ARD lab, I can also

6    say they are an ISO certified lab, they are

7    recognized as very reliable labs throughout

8    the U.S.

9              And Chemsultants follows the, I

10   know Chemsultants because I've been there and

11   their laboratory is standard laboratory

12   conditions, which are roughly 72 to 73

13   degrees Fahrenheit.

14        Q.  So you can assume what the

15   temperature was, correct?

16        A.  Right.

17        Q.  You don't know what the temperature

18   was?

19        A.  I don't know for a fact, but knowing

20   Chemsultants and the way they do business,

21   it's very probable it was held at the

22   standard lab temperature.

23        Q.  But you just relied on what they

24   did, you didn't run any test to know they

25   adhered to these standards that you just

1   recited?

2       A.  No, I did not, I just read the

3   report.

4       Q.  Okay.  And those tests are

5   temperature sensitive, aren't they?

6       A.  Absolutely.

7       Q.  And do you know what the dwell time

8   was for those tests?

9       A.  Generally, generally --

10      Q.  No, I want to know, do you know what

11  the dwell time was for the tests?

12      A.  I know what's required; I don't know

13  if they actually followed that.

14      Q.  Thank you.  And you didn't run

15  tests?

16      A.  No.

17      Q.  So you can't tell me what the dwell

18  time or the temperature was?

19      A.  No, but that's a phone call.

20      Q.  Well, that's a phone call for some

21  hearsay from you, right?

22              MR. COHN:  Objection.

23              THE WITNESS:  No, it's a phone

24  call to the lab asking them to state what the

25  conditions were and then it's done.

1  BY MR. WEBER:

2      Q.  Okay.  Still on page four of your

3  report, it says figure one below shows a

4  cross-sectional view of the accused Superior

5  Mark adhesive tape, do you see that

6  paragraph?

7      A.  Uh-huh.

8      Q.  And you determined that ninety-five

9  percent of that product has the polymer layer

10 with a thickness literally in the claimed

11 range?

12     A.  Uh-huh.

13         MR. COHN:  Objection, you're

14 quoting it and didn't do it correctly.

15 BY MR. WEBER:

16     Q.  Well, I wasn't quoting but was it

17 literally in the claimed range?

18     A.  Yes.

19     Q.  And ninety-five percent of it was

20 within that range and where was that

21 ninety-five percent?

22         MR. COHN:  Objection, you have a

23 preface to the question that you didn't give

24 him a chance to disagree with.

25         MR. WEBER:  You said more than

1   ninety-five percent, was that your problem?

2             MR. COHN:  It is.

3   BY MR. WEBER:

4       Q.  Okay, more than ninety-five percent?

5       A.  Okay, if you take, and I took it from

6   Mr. Cliff Lowe's declaration which is, I

7   don't know if you have it here, but he gave

8   examples of two inches, four inches and six

9   inches.

10             If you take the six inches and

11  take it where that center portion is, I

12  forget the exact dimensions but you divide

13  that by the total and you get ninety-five

14  something.  If you do it for the four inches

15  you get ninety-four point something and if

16  you do it for two inches you get something,

17  so I took it from his report.

18      Q.  All right.  So you, you measured the

19  thickness because that's what this claim

20  limitation is all about, right, it's the

21  thickness of the polymer layer; is that

22  correct?

23      A.  Yes.

24      Q.  And we'll look in the patent.

25      A.  Yes.

1     Q.  Okay, you agree with that, okay.  So

2   you measured the thickness?

3     A.  I took Mr. Lowe's information and

4   used his information.

5     Q.  Okay.

6     A.  I measured.

7     Q.  Length?

8     A.  Yes.  But I also measured weight and

9   I also measured, calculated an area.

10    Q.  Okay, the patent doesn't say

11  anything about weight, does it, as far as a

12  way to measure the thickness of the polymer

13  layer?

14    A.  No.

15    Q.  Okay.

16    A.  However -- may I comment?

17    Q.  No.  I mean your answer is no, it

18  doesn't?

19    A.  Right.

20    Q.  It doesn't saying anything about area

21  either, does it?

22    A.  That's correct.

23    Q.  And typically in measuring thickness

24  you measure it in what unit?

25    A.  In the adhesive industry in mils.

1    Q.  Okay.  And in the English system that

2  would be thousandths of an inch; is that

3  correct?

4    A.  Yes, .001 inches is one mil.

5    Q.  Okay.  And that's how almost any

6  right thinking person would measure

7  thickness, right, it's a linear measurement?

8          MR. COHN:  Objection.

9          THE WITNESS:  Not necessarily.

10  BY MR. WEBER:

11    Q.  The patent doesn't tell you to

12  concern yourself with cross-sectional area,

13  does it?

14    A.  Correct.

15    Q.  The patent doesn't tell you to

16  concern yourself with weight or mass of the

17  polymer layer, does it?

18    A.  Correct.

19    Q.  But yet that's what you chose to

20  measure?

21    A.  Yes.

22    Q.  Was that, did you come up with that

23  or was that, was that suggestion planted in

24  your mind?

25    A.  No, that's from my forty years of

1   experience in the adhesive industry, because

2   measuring thickness can be very difficult at

3   times, so whenever there's a dispute about

4   thickness, then we go to weight because

5   weight, there's no question about weight.

6                    That's why I went to weight,

7   that's why I went down the road I went on,

8   basically because my experience in the

9   adhesive industry, we've seen it time and

10  time again, when a person makes a product

11  they will say I want X mils of thickness,

12  nine times out of ten they will say it will

13  have a certain weight.

14      Q.  But this patent doesn't say that?

15      A.  That's correct.

16      Q.  And in fact putting aside your forty

17  years of experience, how about your one year

18  of experience in studying the '480 patent,

19  can we focus on that?

20      A.  Sure.

21      Q.  And you've agreed that the '480

22  patent treats the polymer layer as to

23  thickness?

24      A.  Correct.

25      Q.  Not area, not mass?

1      A.  Correct.

2              MR. COHN:  Objection.

3              MR. WEBER:  But thickness?

4              MR. COHN:  Objection.

5              THE WITNESS:  Correct.

6    BY MR. WEBER:

7      Q.  And while you as a person of

8    extraordinary skill in the art know, well,

9    what I can do is I can take area and I can

10   take mass and I can then extrapolate, that

11   isn't what the, the patent doesn't make

12   mention of that, does it?

13             MR. COHN:  Objection.

14             THE WITNESS:  Correct.

15   BY MR. WEBER:

16     Q.  Okay.  In fact the construction that

17   the Court issued as a matter of law in this

18   case does not limit the term "significant" to

19   weight, does it?

20     A.  I believe you are correct.

21     Q.  And the construction ruled by the

22   Court does not limit the word "significant"

23   to area, does it?

24     A.  You are correct.

25     Q.  In fact the construction ruled by the

1  Court doesn't limit the term "significant" at

2  all, does it?

3      A.  Correct, it does not specify what it

4  means by "significant."

5      Q.  Okay.  Now, the claim limitations,

6  the claim itself speaks of thickness,

7  correct?

8      A.  Uh-huh.

9      Q.  And thickness correlates to the

10  cross-sectional height of the polymer layer,

11  doesn't it?

12      A.  Yes.

13      Q.  And a step is normally considered in

14  the context of height, isn't it?

15      A.  Yes.

16      Q.  Okay.  You remember Neil Armstrong

17  and the small step and large step?

18      A.  Right.

19      Q.  The steps in your house, those all

20  get you from one level to another in this

21  incremental effort, but you didn't address

22  step in the context of height, did you, in

23  your report?

24      A.  Yes, I did, in my calculations I

25  did.

1    Q.  Okay.  In what calculation, in the

2  percentages, the greater than ninety-five

3  percent?

4    A.  Not in that one, but if you look at

5  the power point, I have a diagram in there

6  where the actual height of the step is used

7  in the calculation to calculate the area.

8    Q.  Oh, okay.  But when you did your

9  conclusions, you don't have any conclusions

10  drawn to the height of the step, do you?

11    A.  No, I based mine on, as I said

12  before.

13    Q.  You purposely disregarded addressing

14  the relative height of the step to the

15  overall height of the cross-section of the

16  product?

17    A.  No, I did not.

18    Q.  But you did disregard it, didn't

19  you?

20    A.  No, I did not.

21    Q.  Okay.  What percentage is the step to

22  the overall thickness?

23    A.  According to Mr. Lowe it's --

24    Q.  No, according to your report?

25    A.  I did not report, I did not report

1  that in my report.

2      Q.  Thank you.

3      A.  But when I did my calculations I did

4  consider it.

5      Q.  Because had you reported it in your

6  report you would have said that step is about

7  sixteen percent of the thickness, wouldn't

8  you?

9      A.  No.

10      Q.  You wouldn't?  What percentage would

11  it have been?

12      A.  According to Mr. Lowe it's eighteen

13  and a half.

14      Q.  Eighteen and a half percent?

15      A.  According to Mr. Lowe.

16      Q.  And you have no reason to believe Mr.

17  Lowe couldn't do that calculation?

18      A.  It's simple math.

19      Q.  But you didn't bother to do it, you

20  relied on Mr. Lowe, is that your testimony?

21      A.  I relied on his number.

22      Q.  Okay.  Now, you considered the term

23  "significant" as to steps, you know the Court

24  used the term "significant" in association

25  with steps, you didn't address the functional

1    significance of the steps in the accused

2    product, did you?

3         A.  In my mind I did, yes.

4         Q.  But not in your report?

5         A.  Correct.

6         Q.  Okay.  You understood that Mr. Lowe

7    thought that the function, that those steps

8    were functionally quite significant, didn't

9    you?

10        A.  Yes.

11        Q.  Okay.  Looking at page five of your

12   report, down near the bottom you're talking

13   about the ARDL report, who do you know at --

14        A.  The last paragraph?

15        Q.  Yes, I apologize, the one bridging

16   the two pages.

17        A.  I see it.

18        Q.  Who do you know at ARDL, anyone?

19        A.  No.

20        Q.  Do you know anyone at Chemsultants?

21        A.  Yes.

22        Q.  Who do you know there?

23        A.  Gary Avalon.

24        Q.  Anyone else?

25        A.  I remember the owner.

1      Q.  Do you remember his name?

2      A.  Dick Muny, M-U-N-Y, and also Mauser,

3  I think it's Richard Mauser, M-A-U-S-E-R I

4  think.

5      Q.  Now, have you known these people for

6  a while?

7      A.  I've known Gary for a long time and

8  Muny.

9      Q.  Have you done any consulting or had

10  any discussion with them with regards to this

11  case?

12      A.  No.

13      Q.  Have you done any consulting or had

14  any discussions with ARDL with regard to this

15  case?

16      A.  No.

17      Q.  You're looking at the test report of

18  ARDL in the paragraph that I directed your

19  attention to, you say it states that peel

20  adhesion of the accused Superior Mark

21  product varies between 2.3 pounds per inch

22  and 6.1 pounds per inch, did I read that

23  correctly?

24      A.  Yes.

25      Q.  How do you account for that

1  variation?

2     A.  That was related to the rate of peel.

3  When they measured the product, they measured

4  it two inches a minute, six and twelve, they

5  measured at three different peel rates and so

6  that's the range.

7     Q.  Do the patent claims address peel

8  rate range?

9     A.  Indirectly.

10    Q.  Okay.

11    A.  When they reference the test method,

12  the test method specifies the peel rate.

13    Q.  Well, the patent, they cite the wrong

14  test method here, haven't they, 101D, that's

15  not the right test method?

16    A.  One skilled in the art would have

17  used 101F but 101D can be modified and

18  that's what it states, they used a modified

19  method.  And therein lies the confusion, did

20  they modify 101D to be more like 101F or is

21  it a typo.

22    Q.  Okay, when you say therein lies the

23  confusion, what do you mean the confusion?

24    A.  Over the method that's reported here.

25  Now if you were to give this to a lab and say

1   test the peel, they would look at that and

2   say, oh, 101D, I think they meant 101F so

3   they would use 101F.

4      Q. If you had given this to an

5   individual who was a banker, what would you

6   expect him to think?

7           MR. COHN: Objection.

8           THE WITNESS: The banker wouldn't

9   know 101D from 2000D.

10  BY MR. WEBER:

11      Q. Or an accountant?

12      A. Same thing.

13           MR. COHN: Objection.

14           THE WITNESS: Or a lawyer, same

15  thing.

16  BY MR. WEBER:

17      Q. Well, I wouldn't say that, I happen

18  to have an engineering degree.

19      A. Okay, well, so you know the

20  difference.

21      Q. Right.

22      A. So you have --

23      Q. Because when I looked at it I thought

24  I need to check the standard?

25      A. Good for you.

Page 51

1      Q.  Well, it's too bad, isn't it too bad

2   that the people who wrote this, to give these

3   teachings to the public, didn't edit it more

4   closely?

5             MR. COHN:  Objection.

6             THE WITNESS:  Yes.

7   BY MR. WEBER:

8      Q.  Thank you.  In fact when I look at

9   this, looking at peel strength it says in

10  claim two, let's jump to Exhibit 53, claim

11  two.

12     A.  That's the claim sheet again?

13     Q.  Yeah, if you go down, you know where

14  the claims are, claim two, go down to line

15  37.

16     A.  Got it.

17     Q.  It says where the adhesive tape has a

18  peel adhesion greater than two pounds per

19  inch width, when you read this patent you

20  didn't see anything in that patent that gave

21  a basis for two pounds per inch width pull,

22  did you?

23             MR. COHN:  Objection.

24             THE WITNESS:  What do you mean

25  basis, the rationale for picking two?

1          MR. WEBER:  Well, two isn't

2   mentioned in any any of these, is it, can you

3   find where two pounds per inch width is

4   mentioned, where three pounds per inch width

5   is mentioned?

6          MR. COHN:  Do you mean to ask him

7   one question?

8   BY MR. WEBER:

9     Q.  Can you find a basis in the '480

10  patent specification for a two pound per inch

11  width peel?

12    A.  You want me to take the time to read

13  to see if it's there?

14    Q.  Well, it's either going to be there

15  or it's not?

16    A.  Right, it's either there or not.

17    Q.  Do you recall seeing that when you

18  read the patent specifications?

19          MR. COHN:  Objection.

20          THE WITNESS:  I don't recall, I

21  do not recall seeing that, I saw five in

22  there.

23  BY MR. WEBER:

24    Q.  Yeah, because if you look at the

25  chart that bridges columns three and four,

1   look at the very last entry on column three,

2   it says adhesion to stainless pounds per inch

3   width.

4       A.  I've got you.

5       Q.  Pounds per inch width, now go up to

6   the top where it continues, and we've got

7   inventive sample, we have 5.2, standard

8   deviation of point five, do you see that?

9       A.  Yes.

10      Q.  That's testing that was done and they

11  came up with 5.2 with a standard deviation of

12  point five, what's that standard deviation

13  mean?

14          MR. COHN:  Objection, you keep

15  giving prefaces and then going to questions.

16  BY MR. WEBER:

17      Q.  Okay, so let's -- do you understand

18  this chart to be talking about the inventive

19  sample as having a 5.2 pounds per inch width

20  adhesion to stainless?

21      A.  Okay.

22      Q.  You understand that?

23      A.  Yes.

24      Q.  Okay.  And it describes above the

25  tests that were undertaken, right?

1      A.   Uh-huh.

2      Q.   So it says 5.2 was an average with a

3   point five standard deviation, is that your

4   understanding?

5      A.   Yep.

6      Q.   Okay.  And five test samples were

7   run, is that what the five is there?

8      A.   Yes.

9      Q.   Now, the 5.2 is more than double two

10  pounds per inch width, right?

11     A.   Yes.

12     Q.   Okay.  And you don't -- let me ask

13  you what the standard deviation of point five

14  means?

15     A.   That means this adhesion would vary

16  between 4.7 and 5.7.

17     Q.   So plus or minus point five?

18     A.   Standard deviation, yes.

19     Q.   So you're saying what, you might be

20  as low as 4.7?

21     A.   No, what it says in this series of

22  five measurements, the population of data

23  would fall in the 4.7 to 5.7 range.

24     Q.   Okay, with an average then of 5.2?

25     A.   5.2.

Page 55

1     Q.  So there's no basis at least in this

2   chart for peel adhesion of two pounds per

3   inch width, right?

4              MR. COHN:  Objection.

5              THE WITNESS:  Are you asking me

6   the rationale for why you picked two, is that

7   your question?

8   BY MR. WEBER:

9     Q.  Well, let's do that one next, okay,

10   let's answer my question first.

11     A.  All right, so your question, say it

12   again please?

13     Q.  Is there any basis in that, in the

14   patent or in that chart for the two pounds

15   per inch width?

16     A.  No.

17     Q.  Okay.  All right, what's the

18   rationale, I'll bite, what's the rationale?

19     A.  I don't know.

20     Q.  Okay.  Next time offer me a question

21   that you know the answer to, okay?

22     A.  I mean he was the inventor, he

23   decided he wanted two, so he picked two.

24     Q.  Okay.  Inventors do those things?

25     A.  Absolutely.

Page 56

1      Q.  All right.  Let's look at page seven

2  of your report.

3      A.  The same report?

4      Q.  Yes, yes.  Here at section B you're

5  saying the Superior Mark products infringe

6  claims two to four because the differences

7  are insubstantial to a person having ordinary

8  skill in the art, correct?

9      A.  Uh-huh, yes.

10     Q.  Now I apologize if I'm repetitious of

11  what we've discussed earlier but I want to

12  try to wrap it up here.

13            You've concluded that the

14  Superior Mark tapes or the accused tapes do

15  not have a layer of non-adhesive material

16  with adhesive on both sides, correct?

17     A.  Yes.

18     Q.  Okay.  And to find infringement

19  you've determined that the layer of

20  non-adhesive material is unnecessary,

21  correct?

22     A.  Right.

23            MR. WEBER:  Okay.

24            (Discussion had off the record.)

25            MR. WEBER:  Let's mark this.

1                    (Defendant's Exhibit

2                    No. 55 was marked

3                    for identification.)

4    BY MR. WEBER:

5        Q.  I've handed you what's marked as

6    Exhibit 55, are you familiar with that

7    exhibit?

8        A.  The first time I'm seeing it.

9        Q.  Okay.  It talks about different Shore

10   assessments, in fact take your time and look

11   it over.

12       A.  (Doing as requested.)

13       Q.  Did you read it over?

14       A.  I scanned it.

15       Q.  Is there anything that jumped out at

16   you that you would disagree with?

17       A.  No, it's typical sales literature.

18       Q.  Okay.  Shore was the name of a

19   company, wasn't it?

20       A.  I'm not sure.

21       Q.  Okay.  It says in the first sentence

22   there, "Hardness is defined as a material's

23   resistance to indentation when a static load

24   is applied," did I read that right?

25       A.  Yes.

1    Q.  And that's true, correct?

2    A.  Yes.

3    Q.  By static load, what do you

4   understand that to mean?

5    A.  Dead weight.

6    Q.  Dead weight, just setting there, not

7   impacting it, no momentum, no velocity,

8   nothing, right?

9    A.  Right.

10    Q.  Okay.  And the common instrument is

11   the Shore durometer, correct?

12    A.  Yes.

13    Q.  Now, down in the next sentence it

14   says, "A zero reading indicates that

15   penetration depth was at its maximum; a

16   reading of 100 specifies there was no

17   penetration."

18              So that would mean that you go

19   from, as you go from zero to a hundred, the

20   material is getting harder and more resistant

21   to penetration, correct?

22    A.  Yes.

23    Q.  And then there's three scales, at

24   least here there's a Shore A, a Shore D and a

25   Shore 00, are you familiar with those three

1    scales?

2         A.  The A and D.

3         Q.  The A and D, you're not familiar with

4    the double aught?

5         A.  Right.

6         Q.  Okay.  And those are shown in a chart

7    or graph form almost in the center of Exhibit

8    55, right?

9         A.  Right.

10        Q.  And do you understand the Shore A and

11   Shore D scales to be linear scales, they're

12   not logarithm?

13        A.  They're within themselves.

14        Q.  Right, okay, so their increments are

15   uniform, correct?

16        A.  They call them Shore units.

17        Q.  Okay.  And it's the same distance

18   going from zero to twenty as from twenty to

19   thirty?

20        A.  Correct.

21        Q.  And from thirty to forty?

22        A.  Correct.

23        Q.  And you understand what I mean by a

24   logarithmic scale, correct?

25        A.  Uh-huh.

1       Q.  Okay.  So these are linearly

2   incremental and if we go here to the second

3   paragraph, it says the Shore A scale is the

4   most common scale for TPE's, what's a TPE?

5       A.  Thermoplastic elastomers.

6       Q.  Okay.  And a Shore A durometer

7   consists of a blunt indenter with moderate

8   spring force, you agree with that, right?

9       A.  Uh-huh.

10      Q.  And what happens is this blunt

11  instrument, which is biased by a spring, as

12  penetration is made there is deflection,

13  correct?

14      A.  Uh-huh.

15      Q.  And that deflection will read

16  somewhere on the Shore chart --

17      A.  Yes.

18      Q.  -- correct?

19      A.  Yes.

20      Q.  It's my fault, not yours, we need to

21  not talk over each other.

22      A.  Okay.

23      Q.  You need to answer audibly and we

24  don't talk over each other because then he'll

25  get up and walk out.

1     A.   Okay.

2     Q.   Now, it says Shore A instruments are

3   less accurate when readings are above 90, and

4   that's true, isn't it?

5     A.   Possibly.

6     Q.   Okay.  Because getting up to 90,

7   you're pretty much right at the end of the

8   scale, correct?

9     A.   Yes, 90 is close to 100.

10     Q.   Okay.  And so what does the person

11   who really knows what he's doing with a, and

12   he's measuring the hardness of a material

13   with a durometer, do when he's getting up

14   close to 100 on a Shore A scale?

15          MR. COHN:  Objection.

16          THE WITNESS:  I can't answer what

17   a person would do.

18   BY MR. WEBER:

19     Q.   You wouldn't know?

20     A.   Well, I don't know what someone else

21   is going to do.

22     Q.   What would you expect a person to

23   do?

24          MR. COHN:  Objection.

25          THE WITNESS:  I can't answer what

1   I would expect a person to do, I mean I can

2   only answer for what we do in ours, what

3   we've done in the past.

4   BY MR. WEBER:

5       Q.  What have you done in the past then?

6       A.  If we're doing a measurement like

7   this and we had all our history on a Shore A,

8   we stay with a Shore A.

9       Q.  Okay, you'd stay with a Shore A, all

10  the history --

11          MR. COHN:  He's still talking and

12  you --

13  BY MR. WEBER:

14      Q.  And I apologize, were you done with

15  your answer?

16      A.  If we have the historical data that

17  was completed with a Shore A, then we would

18  stay with a Shore A, we wouldn't change.

19      Q.  Although you would know that you

20  would probably get better resolution by going

21  to a Shore D, correct?

22      A.  If you needed better resolution, you

23  are correct, you'd get better resolution in

24  the mid range.

25      Q.  Okay.  And why is that?

Page 63

1       A.   Simply because you have more spread.

2       Q.   Sure, so you get better resolution,

3   correct?

4       A.   Well, yes and no.  And the reason I

5   say yes and no is because when you look at

6   the actual tip of the, of the probe that goes

7   down into the, into the polymer, into the

8   layer, in the case of the soft material it's

9   flat and round, I think it's about .78

10  millimeters or .8 millimeters in diameter and

11  only has .8 gram load, it has a .8 pound load

12  on it, so it's very low.

13             So you've got a bigger surface

14  area that you're dealing with, which is

15  better because now you're spreading the load

16  out, you disperse the forces, versus the

17  Shore D, which is a more pointed probe, and

18  I'm trying to remember the radius, I can't

19  recall but it's a very blunt probe, so you're

20  looking at a smaller area.

21      Q.   No, it's a very sharp probe?

22      A.   Well, okay, I'm not going to argue.

23      Q.   Well, no, I apologize --

24      A.   The radius is there.

25      Q.   Okay.

Page 64

1      A.  It's sharp relative to the flat.

2      Q.  Okay.

3      A.  So I forget what the radius is, then

4  that has a ten pound load.  Now the rationale

5  is if you've got the flat foot, it's going to

6  be harder to push into a hard material.  And

7  with only an eight, I think it's a point

8  eight pound load on it, it's hard to push, so

9  that's why they went to the more rounded

10  probe and a heavier weight.

11           So with that said, can I say

12  that it's going to be better?  I would say,

13  you know, the rationale, our rationale would

14  be not to change to Shore D if we had the

15  history at Shore A.

16                If we were starting fresh,

17  with a new material, and if we knew what the

18  hardness was, we would probably make some

19  measurement and then make the decision which

20  probe to use.

21      Q.  Okay.  Yeah, you would you want the

22  probe to be consistent throughout, correct?

23      A.  Absolutely.

24      Q.  Particularly if you're looking for

25  how things might change or deviate?

1      A.   Right.

2      Q.   Do you agree with the statement down

3    in the third paragraph of Exhibit 55 that

4    says instantaneous readings typically give

5    higher, or harder, results than delayed

6    readings?

7      A.   To me that's a fair statement.

8           MR. WEBER:  Okay.  Why don't we

9    take a short break and I'm very close to

10   being done, probably another twenty minutes

11   or so.

12                    - - -

13              (Short recess had.)

14                    - - -

15              (Defendant's Exhibit

16              No. 56 was marked

17              for identification.)

18   BY MR. WEBER:

19     Q.   I've handed you, Mr. Serra, what's

20   been marked as Exhibit 56, have you seen this

21   document before?

22     A.   I saw part of this yesterday.

23     Q.   Okay, just yesterday, is that

24   correct?

25     A.   Yes.

1      Q.  Okay.  Now this was filed in the

2  Patent Office on May 8th of this year, but

3  you saw it for the first time yesterday?

4      A.  Yes.

5      Q.  Okay.  Now, looking at page ten of

6  this document, numbered page ten, it's

7  probably the eleventh page but you'll see the

8  paragraph that bridges pages ten and eleven,

9  it says, "In other words, across all uses,"

10  et cetera, do you see that?

11      A.  Yes.

12      Q.  Did you participate at all in the

13  preparation of that paragraph and submission

14  to the Patent Office?

15      A.  Let me read it quickly.

16      Q.  Sure, sure, take your time.

17      A.  (Doing as requested.)

18            You know, I did read the

19  Kjellqvist patent but I don't recall ever

20  writing or working on that paragraph.

21      Q.  Okay.  And would the first time that

22  you would have seen that paragraph been

23  yesterday, to the best of your knowledge?

24      A.  To the best of my knowledge, yes.

25            MR. WEBER:  Okay.  I'll ask the

1    Reporter to mark this as Exhibit 57.

2                         (Defendant's Exhibit

3                         No. 57 was marked

4                         for identification.)

5    BY MR. WEBER:

6        Q.  Now, do you recognize Exhibit 57?

7        A.  Yes, I believe this is the one I read

8    many, many months ago.

9        Q.  Okay.  And you recognize this patent

10   as dealing with floor, wall or ceiling

11   coverings, correct?

12       A.  Yes.

13       Q.  Okay.  And that they used a polymer

14   as a body of the coverings, the polymers?

15       A.  Yes.

16       Q.  Obviously you can look at whatever

17   you want to look at to refresh yourself a

18   little if you'd like to but if you'll go to

19   column 13, around line four, the paragraph

20   that begins, "The floor, wall or ceiling

21   covering of the present invention," do you

22   see that?

23       A.  Yes.

24       Q.  Did you ever convert those

25   measurements from metric to English?

1      A.  I believe I did.

2      Q.  Okay.  And when you did you found out

3  that those thicknesses fell within the

4  claimed range of the '480 patent?

5      A.  I don't know what the data is.

6      Q.  Okay.

7      A.  But I think I did, I think I do

8  remember converting those.

9      Q.  Okay.  And the conversion would be

10  what, how many centimeters in an inch?

11      A.  2.54.

12      Q.  Okay, so if you take 2.54 centimeters

13  per inch?

14      A.  You normally use 25.4 and do the

15  math.

16      Q.  Right, 25.4, you use the factor label

17  method, do you remember the factor label

18  method?

19      A.  Before my time.

20      Q.  Okay, all right, but you can easily

21  convert, right?

22      A.  Yes.

23      Q.  Okay.  And then it will tell you

24  whether or not those measurements do fall

25  within the --

Page 69

1      A.  Correct.

2      Q.  -- range of the claims, correct?

3      A.  Correct.

4      Q.  Okay.  And down at column 15, around

5   line 59.

6      A.  Okay.

7      Q.  It talks about, you know, common

8   adhesives, generally common adhesives such as

9   acrylic or styrene, butadiene based adhesives

10  can be used to fix the coverings to floor,

11  ceiling or walls, correct?

12     A.  Yes.

13     Q.  Okay.  And you understand that to be

14  a teaching of this patent, right, that's what

15  the patentee is saying, that you can use

16  those types of adhesives?

17     A.  If that's what you mean by teaching,

18  yes.

19     Q.  Okay.  And then it's saying to use

20  those types of adhesives basically because

21  you don't need a primer, correct?

22     A.  He's saying that.

23     Q.  Okay.  Do you recall looking at these

24  examples, one to thirty-three, starting in

25  column twenty of this patent?

1      A.  Column twenty?

2      Q.  Yeah, column twenty, if you look down

3  there around line 25 or 22 it says examples

4  one to thirty-three?

5      A.  Yes, I see that.

6      Q.  Okay.  Did you look at those various

7  examples.

8      A.  Yes, I did, I scanned those.

9      Q.  Okay.  And if you look at those

10  examples, they're charted out then on the

11  next couple of pages, the thirty-three, and

12  the Shore A hardness of those examples are

13  given in the chart, right?

14      A.  Yes.

15      Q.  Okay.  And those are whatever they

16  are, correct, I mean you and I can't change

17  that?

18      A.  Correct.

19      Q.  And a lot of those fall in the range

20  of 92 to 100, don't they?

21      A.  Yes.

22      Q.  And 92 to 100 is the range set forth

23  in the '480 patent, correct?

24      A.  Yes.

25      Q.  And if you went back and did the

Page 71

1    conversion, factor and label method or

2    otherwise in column thirteen of the patent

3    that we talked about, you wouldn't be

4    surprised that the thicknesses of the patent

5    also fall within those ranges, would you?

6            MR. COHN:  Objection.

7            THE WITNESS:  You're saying go

8    back to column thirteen and do these

9    conversions?

10   BY MR. WEBER:

11     Q.  Yeah, if you did those conversions?

12     A.  I'd say some of them would probably

13   fall within that range.

14           MR. WEBER:  Okay.  I'm going to

15   ask, what I've got here, counsel, is an

16   exhibit that you marked this morning as

17   PX 24, do you want me to, I mean I'm happy

18   to, I'll put a D exhibit on it as well.

19           MR. COHN:  It's your record, do

20   whatever you want.

21           MR. WEBER:  Okay, well, I just

22   don't want to confuse you.  This is PX 24 and

23   we'll call it DX 58.

24                   (Defendant's Exhibit

25                   No. 58 was marked

1                    for identification.)

2    BY MR. WEBER:

3        Q.  I've handed you what's been marked as

4    Exhibit 58, which is an office action from

5    the ex parte re-examination, have you seen

6    this before?

7        A.  I saw this late yesterday.

8        Q.  Late yesterday?

9        A.  Yes.

10       Q.  Okay.  And did you study it?

11       A.  No, I read it very quickly.

12       Q.  Okay.  So you didn't form any

13   opinions as to whether the examiner was right

14   or wrong?

15       A.  No, I did not.

16       Q.  Okay.  So yesterday was the first

17   time that you ever saw Exhibit 56 or 58; is

18   that correct?

19       A.  Yes.

20       Q.  Okay.  Now, did you see that for

21   purposes of your deposition today or just for

22   your own edification?

23       A.  For information.

24       Q.  Just for information?

25       A.  Yes.

1      Q.  Okay.  You have several patents,

2  correct?

3      A.  Yes.

4      Q.  Okay.  And you understand that as a

5  patent applicant you have a duty of candor

6  with the Patent Office, correct?

7      A.  Yes.

8      Q.  Okay.  And what does that duty of

9  candor require?

10          MR. COHN:  Objection.

11  BY MR. WEBER:

12      Q.  To satisfy that duty of candor?

13      A.  You have to tell the Patent Office

14  what you know about the invention, disclose

15  to them what your invention is and supply

16  them with any information that you have for

17  your application, at the time of the

18  application, as well as if you have any prior

19  references, you have to submit all that as

20  well.

21      Q.  So prior art references or prior art

22  information, correct?

23      A.  Right.

24      Q.  And you understand that you can't

25  play games with the Patent Office during the

1  prosecution, correct?

2      A.  Correct.

3            MR. COHN:  Objection.

4  BY MR. WEBER:

5      Q.  And you can't make representations

6  or statements to the Patent Office that you

7  know you couldn't make if the Patent Office

8  knew things that you knew, is that fair to

9  say?

10            MR. COHN:  Objection.

11            THE WITNESS:  Say that once

12  again?

13  BY MR. WEBER:

14      Q.  Okay.  If you know of prior art that

15  you have not disclosed to the Patent Office

16  and if that prior art would have been

17  material to claims that you were presenting

18  to the Patent Office --

19      A.  Yep.

20      Q.  -- that would be a violation of your

21  duty of candor, wouldn't it?

22      A.  Yes.

23      Q.  Okay.  And then if you made arguments

24  to the Patent Office that you can only make

25  because you know the Patent Office doesn't

1  know of the prior art that you're holding

2  back, that's also a violation of that duty,

3  correct?

4      A.  Yes.

5      Q.  Okay.  And you know that from dealing

6  with your patent attorney and prosecuting

7  patents, correct?

8      A.  Yes.

9          MR. WEBER:  I think I'm done, I

10 appreciate your courtesy and your patience.

11         THE WITNESS:  You're welcome.

12         MR. COHN:  We're not quite done

13 though.

14              - - -

15 BY MR. COHN:

16     Q.  In your report, which was marked in

17 this deposition as I think Exhibit 54.

18     A.  Got it.

19     Q.  In your discussion of claim five,

20 I'll draw your attention to where that was,

21 I'm talking about the reference to the

22 thickness?

23     A.  Claim five starts on page three.

24     Q.  I think we were on page seven.

25     A.  Okay.

1      Q.  In answer to some of Mr. Weber's

2   questions regarding the measuring of the

3   thickness of the accused product and the

4   measurements that you did, you indicated

5   that you wanted to talk about the weight, do

6   you recall that?

7      A.  Yes.

8      Q.  Please explain what it was about the

9   weight that had meaning to you in connection

10   with measuring the thickness?

11      A.  Because the thickness measurement,

12   depending on how it's measured, and there

13   are different tools used to measure, there's

14   what they call a snap gauge, which is a

15   handheld gauge.

16              And when you use that handheld

17   gauge you can get some variation because you

18   literally pull the trigger, it raises the

19   presser foot, which then when you release it

20   it comes down and touches it.

21              And there's no set dwell time,

22   there's no set pressure on it, and so you can

23   get some variation.  Although it's still used

24   in the industry today as a means of measuring

25   thickness, however, it's not one of the best

1  ways to do it.

2            Then there's the, then there's

3  the automated kind, which is, it's a

4  mechanical one, it has an anvil and a presser

5  foot that can, given area, given weight,

6  given time, coming down and touching the

7  product, and so it's a better test for

8  thickness.  But even that has some error in

9  it.

10            So when you really want to

11  understand the thickness of your product,

12  you always go to weight per unit area,

13  because that nails it and there's no question

14  about it.  That is, that's the way the

15  industry does it.

16            That's why I went to weight,

17  because I knew it eliminated all those other

18  issues because it's based, it's based on the

19  polymer that you've used.

20    Q.  So when you use the weight as a way

21  to measure thickness, were you taking into

22  account the language of claim five?

23            MR. WEBER:  Objection.  Go ahead.

24            THE WITNESS:  Well, when you use

25  weight to measure it, it's based on weight,

1  it's the physical amount of material there,

2  so in that sense you take into account that

3  recess or step, whatever we're calling it.

4                    When I did the area

5  calculation, and if you look at that -- well,

6  let me rephrase that.

7                    The weight measurement, the way

8  the weight measurement was conducted, that

9  step was cut out of the sample.  So the step

10  weight was actually part of the analysis,

11  just that little step.  So that, that was

12  weighed individually.

13                    So by doing that you have the,

14  you have the total material there, in which

15  case you have the thickness there, okay.  And

16  then when I did the area measurement, and if

17  you look at the exhibit that I included --

18            MR. WEBER:  Are you just

19  anticipating his next question?

20            THE WITNESS:  No, because I was

21  talking about area, because I did it three

22  ways.

23            MR. WEBER:  All right, did you

24  hear your counsel's question?

25            THE WITNESS:  The question was?

1           MR. COHN:  Do you want to make me

2    ask it or do you just want to --

3           MR. WEBER:  Well, you guys have

4    obviously rehearsed this quite well, so go

5    ahead, I'm anxious to hear this.

6           THE WITNESS:  Well, I take

7    objection if you think we rehearsed this

8    because we didn't.

9           MR. WEBER:  Well, what I take

10   objection to is you didn't measure the height

11   or the -- you measured it but you didn't put

12   it in the report, that's what I take

13   objection to.

14          MR. COHN:  Well, we're about to

15   show you.

16          MR. WEBER:  Go ahead.

17          THE WITNESS:  We'll show you, if

18   you go over to this chart and you look at

19   this little triangle, the height from Mr.

20   Lowe's declaration where he has all his

21   diagrams, that's the height I used.

22          MR. WEBER:  Go ahead.

23          THE WITNESS:  So I used that and I

24   did a first approximation to calculate the

25   contribution using that height and that's

Page 80

1    what I presented in my, in my declaration.

2    BY MR. COHN:

3        Q.  And just to be clear, the testimony

4    you've just given about the use of weight in

5    measuring thickness, is your work in that

6    regard shown in the report somewhere?

7        A.  The summary is.

8        Q.  Where is that?

9        A.  That was in here, that was given,

10   because I did it, I wanted to be thorough so

11   I did it two ways to see if I could get a

12   correlation, and that's why I was going to

13   the other one, sir.

14       Q.  We're going to get to that but for

15   purposes of what you were saying about

16   weight?

17       A.  What page were we on, it's close to

18   that?

19       Q.  Page seven?

20       A.  I know it's in here.  Yeah, right

21   here, go to page five and that first

22   paragraph, about the one, two, three, four,

23   five, sixth line down.

24                 It says I have calculated that

25   the features identified by the numbers,

1    quote, 32, end quote, in the above figure,

2    which is figure one, account for less than

3    one percent of the overall weight of the

4    polymer, roughly 0.039 percent for a four

5    inch wide tape.

6         Q.  And then you go on to refer to an

7    exhibit?

8         A.  Yeah, that's the --

9         Q.  Where you were reading from?

10        A.  Yeah, over here.

11        Q.  Page five, where you were reading, is

12   there a reference to an exhibit?

13        A.  I said these are summarized in

14   exhibit 3, so if you go to exhibit 3, the

15   weight calculation is there.

16        Q.  And I didn't want to cut you off but

17   I'm ready to move onto area.  How did you do

18   area in determination of thickness?

19        A.  The area, I then took the diagrams

20   from Mr. Lowe's report and I then did as I

21   said, a first approximation of that area.  I

22   didn't get into a lot of math, so I treated

23   it as basically a rectangle and triangle.

24                    And what I found doing it both

25   ways, I had pretty good correlation so I

Page 82

1   stopped at that point, I didn't go any

2   further.  If you compare the area measurement

3   versus the weight measurement, they're fairly

4   close to each other and I said that's a

5   pretty good indication of the contribution of

6   that step or recess to the product.

7            So that was my rationale for

8   doing it that way.  And the reason I did area

9   was to see if I could verify the weight

10  measurement.

11     Q.  And it was pointed out to you that

12  Judge Nugent in his claim construction used

13  the word "significant" in talking about the

14  substantially uniform thickness, Exhibit 52.

15           The bottom of page eleven,

16  this is your copy of Exhibit 52, there's a

17  sentence where the Judge gives his ruling on

18  the meaning of substantially uniform

19  thickness and he talks about without

20  significant deviations, protrusions or

21  steps.

22           Did your calculation of weight

23  and/or area have any relationship in your

24  mind to whether or not the accused product

25  had significant deviations, protrusions or

1    steps?

2        A.  That's why I did the calculation, I

3    wanted to see if in fact we did have, quote,

4    significant, end quote, contributions to the

5    product.

6        Q.  And in using those calculations with

7    regard to the word "significant," why did

8    you, as someone who has worked with these

9    tapes, why would you use weight or area to

10   measure what is or is not significant in

11   terms of thickness?

12       A.  If I understand the question, I did

13   the weight measurements because when you do

14   the -- if you only base it on thickness,

15   you're basing it on something that's only a

16   small area of the total product.

17                 You're basing it, it's not

18   point, it's bigger than point but you're

19   basing it on a single or in this case double

20   because they're on each edge.

21                 You are basing that deviation,

22   it's supposed to be across the whole sheet,

23   this is only on the edge and it's a small

24   amount of the edge.  So I said if it's really

25   significant, I should see that reflected in

1    the overall product as well.

2              And so that's why I did the

3    calculations the way I did the calculations.

4    And again I did them two ways, to see if I

5    could, to see if I would get a reasonable

6    correlation.

7    Q.  And on cross examination during this

8    deposition you were asked whether you

9    considered functionality in terms of the word

10   "significant."  Are you familiar with what

11   the Defendant and its principal indicated the

12   functionality is of the step in each lateral

13   edge?

14   A.  My understanding is that the step

15   prevents the adhesive from oozing out

16   underneath that edge.

17              And while I would disagree

18   with that, because this is a viscoelastic

19   material and if you have a forklift or if

20   you have a heavy weight that runs over the

21   edge and doesn't cover that step when it

22   hits it, just on the inside of that step,

23   the weight from that adhesive, the weight

24   from the forklift or whatever going over it

25   would, with time is going to force that

Page 85

1    adhesive out from underneath that step, it's

2    going to ooze, it has to because it's a

3    viscoelastic material and with time that's

4    going to happen.

5              So while it may retard it or

6    slow it, with time it's going to ooze because

7    it's pressure sensitive.

8              MR. COHN:  That's all I have.

9                   - - -

10   BY MR. WEBER:

11      Q.  So let me make sure that I

12   understand.

13      A.  Okay.

14      Q.  If we look at your expert report, can

15   you show me from an area standpoint what you

16   considered the step to be?

17      A.  Sure.  Do you have the page?

18      Q.  Well, I want you to tell me.

19      A.  Okay, go to the page titled "First

20   Approximation of Recess Contribution to Total

21   Polymer Layer Based on Area."

22      Q.  Okay.  Can you point to me?

23      A.  Yes, if you look --

24              MR. COHN:  Let him ask a question.

25   BY MR. WEBER:

1      Q.  The element, the element, that was

2   the area of the step?

3      A.  Yes, if you look at the exhibit, on

4   the bottom left-hand side of the page that

5   has the words detail A, scale thirty to one

6   on it, do you have that, right here.

7      Q.  Okay.  All right, yep.

8      A.  You'll see the arrow that goes from

9   A, letter A, pointing to that triangle.

10     Q.  So what you're calling a step is the

11  tapered edge, correct?

12     A.  Yes.

13     Q.  So you're looking at the area of the

14  edge from where the step actually -- above

15  the dimensions for where a step actually

16  occurred?

17     A.  Yes.

18     Q.  Because the rest of that triangle is

19  going down, right, that whole piece that you

20  have darkened in there is of varying height,

21  isn't it?

22     A.  No, no, because according to Mr.

23  Lowe's diagram it's .027.

24     Q.  You've colored in the whole wedge?

25     A.  I did, because you can see it.  But

Page 87

1   if you look at Mr. Lowe's diagram without

2   the colored wedge, I did this so you can see

3   this thing, this height, this .027 came from

4   Mr. Lowe's diagram, that's not my number.

5        Q.  I'm not saying it is.

6        A.  Which represents the height, because

7   when he calculated the height, he took that

8   .027 and divided by the total and that's how

9   he got his eighteen and a half percent, so

10  that height is the same height Mr. Lowe used

11  in his calculation.

12       Q.  Tell me again what you think Mr. Lowe

13  did?

14       A.  When he calculated the overall

15  contribution of this, he based it on the

16  height of the step over the overall thickness

17  and that's how he got his eighteen percent, I

18  think it's eighteen and a half.

19       Q.  And what was the height?

20       A.  .027.

21       Q.  That was the height of the step?

22       A.  Yes.

23       Q.  Okay.  That's your testimony?

24       A.  Yes, sir.

25       Q.  Okay.  And then what was the overall

1    thickness?

2        A.  That is the thickness but it's not

3    overall, it's a step, it's on that taper.

4        Q.  Well, a taper is a ramp, a step is a

5    --

6        A.  Well --

7        Q.  A step goes into a transition, an

8    instantaneous transition from one level to

9    other?

10       A.  Correct.

11       Q.  That's certainly how you understand a

12   step, right?

13       A.  Yes.

14       Q.  Okay.  And tell me what you

15   understood the height of the step to be?

16       A.  .027.

17       Q.  And that was from where to where?

18       A.  From the top of, from the -- how can

19   I describe it -- from the bottom of where

20   that step begins to the top of the step,

21   where it ends.

22       Q.  Okay.  And then what was the, say you

23   had .027 and what was it divided by or what

24   was the next number of concern?

25       A.  Then what I had to figure out, what's

1   the width of it, so I could calculate the

2   area from that, because I'm treating it as a

3   triangle.  And the width therefore again from

4   Mr. Lowe's statement, from his report, said

5   it was, I'm trying to read this upside down,

6   was .058.

7                    So then from that I can now

8   calculate the area based on the height

9   divided by two of that triangle.  Then that

10  represents the step on this side because it

11  mirrors the other side, so you have two, so

12  multiply times two, so then that tells me the

13  area of the step triangled.

14      Q.  The ramp?

15      A.  Okay, we'll call it a ramp.

16      Q.  Okay.

17      A.  In the product and then I divided

18  that by the total area of the product and

19  that's how I got my number.

20      Q.  And you did the same thing in the

21  weight calculation, right, you cut off these

22  two ramps?

23      A.  Yes.

24      Q.  You measured their mass or weight?

25      A.  Yes.

1      Q.  And then you measured the mass or

2  weight of the entire unit, including the

3  ramps?

4      A.  Less the adhesive, I took the

5  adhesive out.

6      Q.  But of the entire polymer?

7      A.  Right, the polymer layer, total

8  weight of the polymer layer was used in the

9  calculation, yes.

10     Q.  Okay.  And that was the denominator?

11     A.  Yes.

12     Q.  And the numerator was the?

13     A.  The weight of that.

14     Q.  The weight of the two ramps?

15     A.  Correct.

16     Q.  Okay.  So but you understand I think

17  -- as a matter of fact I'm going to leave

18  your earlier testimony as it was, because

19  your earlier testimony was correct, wasn't

20  it?

21     A.  Relative to?  Everything that I said,

22  I said truthfully, everything I've said has

23  been truthful.

24     Q.  And you reaffirm it, correct?

25     A.  Yes.

1    Q.  How deep was the recess in his

2  product, in Mr. Lowe's product?

3    A.  .027.

4    Q.  .027 was the depth of the recess,

5  correct?

6    A.  It was the height of, what you're

7  calling the recess, I'm calling the step

8  here.

9    Q.  We talked about the step, now I'm

10  talking, you understand his product has a

11  recess?

12    A.  Yes.

13    Q.  What's the depth of the recess?

14    A.  That recess?

15    Q.  Or the height of the recess?

16    A.  Hang on here a second.  That depth

17  would be the same as the height of the step

18  because this step comes above that recess.

19    Q.  Okay.  So you're saying the height of

20  the step is .027?

21    A.  No, I'm saying Mr. Lowe says it's

22  .027, those are not my numbers.

23    Q.  Because you never measured this?

24    A.  No, I relied on what Mr. Lowe

25  provided.

Page 92

1      Q.  And you think what you've done here

2  is consistent with what Mr. Lowe provided and

3  what the claims say and what the Court said,

4  is that your testimony?

5      A.  No, I'm saying to you, what I am

6  saying to you is what I did to try to

7  understand if this step made a significant

8  contribution to the product.

9           So I came up with this method,

10  these two methods, three methods, whatever

11  you're going to call it, to make that

12  determination and to form my opinion.

13      Q.  Okay.

14      A.  That's why I did that, because I

15  disagreed.  Well, I understand Mr. Lowe's

16  calculation, I disagreed with that because it

17  didn't represent the whole product, it only

18  represented a point or a part of it and I

19  said I want to see what this step does

20  relative to the entire product, so that's

21  why I did it.  And when I say the entire

22  product, I should say the polymer layer less

23  the steps.

24      Q.  The significance of a step is

25  typically going from one level to another,

Page 93

1   isn't it, that's what steps are used for?

2       A.  Yeah.

3       Q.  Okay.  I mean that's what the steps

4   in your house do, correct?

5       A.  Yes.

6       Q.  And in fact the steps in your house,

7   there are generally about thirteen of them to

8   go on an eight foot or nine foot span, do you

9   understand that?

10      A.  Yes.

11      Q.  And the height of those steps or the

12  percentage height of those steps is about

13  half the percentage of the step that's in Mr.

14  Lowe's product, do you understand that?

15      A.  I didn't do a calculation so I'd say

16  no, I don't understand that.

17      Q.  Well, could you understand it?

18      A.  If I did a calculation, yes.

19      Q.  Now, we talked about ooze, you never

20  really tested Mr. Lowe's product for ooze,

21  have you?

22      A.  No, I did not.

23      Q.  Did you ever test the product that

24  ShieldMark makes for ooze?

25      A.  Let me answer this, the two questions

1    differently.  I did not run a physical test

2    as in a shear measurement or a real logical

3    measurement.  I did do, excuse me for saying,

4    my finger test.

5                    And since I know the chemistry

6    of the Goecke product, because it's a rubber

7    based adhesive, I know that's got less

8    tendency to flow than Mr. Lowe's product

9    because if you just put it between your

10   fingers you can feel the hardness or

11   softness, whatever you want to say.

12                   I also in my opinion believed

13   that Mr. Lowe's product is a hot melt applied

14   product and by definition if it's a hot melt

15   applied product it's going to have less

16   adhesive drain and a tendency to ooze more

17   than the rubber based product that's on the

18   other product.

19     Q.  And the non-adhesive layer or

20   membrane that's in Mr. Goecke's product also

21   precludes oozing, doesn't it?

22     A.  Yes.

23     Q.  Why didn't you tell me that without

24   me asking it?

25     A.  Because I was concentrating on the

1  adhesive.

2      Q.  Well, the non-adhesive membrane is a

3  part of the adhesive, isn't it?

4      A.  Well, it's a part of the function of

5  the adhesive but if you talk about the

6  adhesive layer that's directly in contact

7  with the floor, I was addressing that

8  adhesive.

9          But you're absolutely correct,

10  the fabric that's the carrier for the

11  double-coated product does two things.  One,

12  it keeps obviously the adhesive separate, and

13  the second thing, it also acts as a

14  reinforcing fabric between two adhesives.

15  But the ooze would be determined by working

16  the adhesive.

17      Q.  And you didn't tell the Court

18  anything like you just told me when you did

19  your Doctrine of Equivalents analysis, did

20  you?

21      A.  No, that was not in any of my reports

22  I don't think.

23          MR. WEBER:  All right.

24          MR. COHN:  One more question.

25              - - -

1  BY MR. COHN:

2     Q.  Did anything in your last discussion

3  with Mr. Weber about the effect of the

4  adhesive on the possibility of oozing, did

5  any of that affect your conclusions regarding

6  whether the two adhesives have functional

7  equivalence?

8          MR. WEBER:  Objection.

9          THE WITNESS:  No, I mean the

10 adhesives will have similar performance, I

11 mean they will be different but they're going

12 to do the same thing, they're going to hold

13 that polymer layer onto the floor.  The

14 function will be the same, different

15 characteristics but yes, they will do the

16 same function.

17          MR. WEBER:  Are you done?

18          MR. COHN:  Yes.

19              - - -

20 BY MR. WEBER:

21    Q.  All of the adhesives mentioned in all

22 of the claims of the '480 patent will perform

23 that function, won't they, they will hold the

24 polymer layer to the floor?

25    A.  I'm trying to recall all the

1   adhesives mentioned.

2       Q.  Well, take your time and let's look

3   at them, if you look at all the claims of the

4   '480 patent, it's Exhibit 53, and tell me

5   which ones in there don't perform the

6   function of holding the polymer layer to the

7   floor?

8       A.  I can't answer that.

9       Q.  Because they all hold it to the

10  floor, right?

11      A.  Yes, but for example in claim one it

12  says a layer of pressure sensitive adhesive,

13  the first side and second side, it doesn't

14  tell me the composition so I can't say is it

15  going to be good enough to hold it.

16      Q.  So you think that might be claiming

17  an inoperative embodiment, is that your

18  testimony?

19      A.  No, I didn't say that.

20      Q.  To be an operative embodiment it

21  would have to hold it to the floor?

22      A.  The question you asked me is can you

23  say that none of these, that one of these

24  adhesives will not function.

25      Q.  Okay, the intention of each one of

1   the adhesives in every claim of that patent

2   is to hold?

3       A.  Yes, correct.

4             MR. WEBER:  Okay.  Are you done?

5             MR. COHN:  I am.

6             MR. WEBER:  I want to thank you

7   for your courtesy and patience.

8             THE WITNESS:  You're welcome.

9                   - - -

10  (Deposition concluded at 1:25 o'clock p.m.)

11                  - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I, JERRY M. SERRA, Ph.D., do verify that I have read this transcript consisting of one hundred (100) pages and that the questions and answers herein are true and correct with corrections as noted on the errata sheet.


-------------------------------------------
JERRY M. SERRA, Ph.D.



Sworn to before me_____, a Notary Public in and for the State of _____, this _____ day of _____, 2013.



_____
Notary Public in and for the
State of _____




My commission expires -----------------------

                    JERRY M. SERRA, Ph.D.

Page/Line              Correction

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

101

C E R T I F I C A T E

STATE OF OHIO, )
                 ) SS:
SUMMIT COUNTY. )

        I, Michael G. Cotterman, a Notary
Public within and for the State of Ohio, duly
commissioned and qualified, do hereby certify
that the within named witness, JERRY M.
SERRA, Ph.D., was by me first duly sworn to
testify the truth, the whole truth and
nothing but the truth in the cause aforesaid;
that the testimony then given by the witness
was by me reduced to Stenotypy in the
presence of said witness, afterwards
transcribed upon a computer; and that the
foregoing is a true and correct transcription
of the testimony so given by the witness as
aforesaid.

        I do further certify that this
deposition was taken at the time and place in
the foregoing caption specified, and was
completed without adjournment.

        I do further certify that I am not
a relative, employee of or attorney for any
of the parties in the above-captioned action;
I am not a relative or employee of an
attorney of any of the parties in the
above-captioned action; I am not financially
interested in the action; and I am not, nor
is the court reporting firm with which I am
affiliated, under a contract as defined in
Civil Rule 28(D).

        IN WITNESS HEREOF, I have hereunto
set my hand and affixed my seal of office at
Akron, Ohio on this 6th day of September,
2013.

--------------------------------------------
Michael G. Cotterman, a Notary
Public in and for the State of Ohio.


My Commission expires October 25, 2017.

# Bish & Associates, LLC
### STENOTYPE REPORTERS

October 14, 2013

In Re: Shieldmark vs Insite
Depostion of Jerry Serra taken on August 30, 2013

To All Counsel:

    Since the witness has not read and signed the transcript within the 30 days allowed under the Rules, signature is deemed to have been waived.

Respectfully,

Michael G. Cotterman
Court Reporter

150 Smokerise Drive, Wadsworth, Ohio 44281
Phone: 330.336.1280   Fax: 330.336.7956
http://www.bish-associates.com      e-mail: bishinfo@bish-associates.com